

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-14-00351-CV

IN THE INTEREST OF E.G. AND
E.S., CHILDREN

----------

### FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
### TRIAL COURT NO. 323-99380J-13

----------

## MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

This is an ultra-accelerated appeal[2] from an order terminating the parental

rights of Appellant V.S. (Mother) to her two children, E.G. (Elijah) and E.S.

----

[1]*See* Tex. R. App. P. 47.4.

[2]*See* Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

(Eliana).[3] In five issues, Mother argues that the evidence is legally and factually insufficient to support the trial court's findings under Texas Family Code section 161.001(1)(D), (E), (N), (R), and (2). *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (N), (R), (2) (West 2014). We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Overview

Mother is the mother of four children, none of whom were living with her at the time of the termination trial. The youngest two children, Elijah and Eliana, were removed from Mother after Eliana's meconium tested positive at birth for methamphetamine and amphetamine. Mother continued to use methamphetamine off and on until a month before the termination trial, failed to work her service plan, failed to visit her children regularly, and was arrested for possession of a controlled substance while this case was pending. Because Mother challenges the legal and factual sufficiency of the evidence to support the trial court's best-interest finding, we set forth a detailed summary of the record below.

### B. Investigator's Testimony

Nikki Ferrell, an investigative supervisor with CPS, testified that she received a referral after Eliana's meconium tested positive for amphetamine and methamphetamine on August 16, 2013. At the time Ferrell received the referral,

---

[3]Pursuant to Texas Rule of Appellate Procedure 9.8(b)(2), we use pseudonyms for Mother's minor children. *See* Tex. R. App. P. 9.8(b)(2).

2

Mother and Eliana had been discharged from the hospital. Ferrell testified that as part of her investigation, she had reviewed Mother's criminal history and previous CPS history: Mother had a 2008 conviction for driving while intoxicated; Mother had previous CPS history, but the allegations were ruled out.

Mother met Ferrell at the CPS office on August 23, 2013. Mother told Ferrell that she had four children, and she listed their fathers.[4] Mother said that Eliana's father was abusive to her; that he had caused her to lose her house, her car, and her job; and that he had fled to Mexico because the police were looking for him.

Ferrell discussed with Mother concerns raised by Eliana's positive test for methamphetamine at birth, and Mother said that she had used methamphetamine about once every two weeks while she was pregnant and that she had last used methamphetamine a couple of months prior to August 23, 2013. Ferrell also discussed the need to place the children outside of Mother's care while she received services.

Mr. Edwards,[5] the father of the two oldest children, agreed to care for all four children while Mother worked services. Although Mother had been living with Mr. Edwards, he agreed to not allow Mother to live in the home or to have

---

[4]Neither Elijah's biological father nor Eliana's biological father had been located at the time of the termination trial.

[5]Pursuant to Texas Rule of Appellate Procedure 9.8(b)(2), we use a pseudonym. *See* Tex. R. App. P. 9.8(b)(2).

3

unsupervised contact with the children. Mr. Edwards said that his sister would care for the children while he was at work and that she would not allow Mother to live in her home or to have unsupervised contact with the children. Mother agreed to the safety plan and signed it. Mother also agreed to engage in Family Based Safety Services (FBSS).

Ferrell testified that the disposition of her investigation was "reason to believe" for physical abuse of Eliana by Mother due to Eliana's meconium testing positive for methamphetamine and amphetamine at the time of her birth and to Mother's admission that she had used methamphetamine during her pregnancy. Ferrell said that there was also a disposition of "unable to determine" for neglectful supervision of Mother's older three children.

### C. Mother's FBSS Caseworker's Testimony

Erica Salinas, who had served as Mother's FBSS worker, testified that she had met with Mother and had explained that Mother needed to complete a drug assessment and, if needed, drug treatment; to attend group and individual counseling; and to submit to random drug testing.[6] Salinas testified that Mother completed the drug assessment, and an outpatient drug treatment program was recommended for Mother. Mother's counselor informed Salinas that Mother had completed only two of the outpatient drug treatment program sessions and had

---

[6]Salinas was aware that Mother had completed a parenting class or a family preservation class prior to the time that Salinas had received the case. Mother said that she had completed the parenting classes called Strengthening Families.

failed to return for the remaining twenty-six sessions; Mother did not begin her individual counseling sessions.

During the time that Salinas was assigned to the case, Mother was allowed visits with the children that were supervised by Mr. Edwards's mother or sister. Salinas said that Mr. Edwards expressed concern over Mother's failure to show up for visits "for a few weeks," but Salinas did not know how many times Mother had visited her children. Salinas said that she lost communication with Mother because she was unable to locate Mother at the address Mother had provided and because the phone number Mother had provided was no longer in service.

During an unannounced visit at Mr. Edwards's home, Salinas learned that Elijah was no longer in Mr. Edwards's care; Elijah's alleged father had picked him up. On November 4, 2013, Mother called Salinas and said that she was staying with friends and that she had possession of Elijah because she did not trust Mr. Edwards or Elijah's alleged father to care for him.[7] Salinas said that this was concerning because Mother had agreed in her safety plan to not have unsupervised access to Elijah based on the allegations of drug use and failure to work her services. Salinas went to the school to talk to Mother's older sons, checked on Elijah, and confirmed that he was unharmed. Salinas learned from

---

[7]Mother did not trust Mr. Edwards because he was angry at her for not wanting to be with him and because he had a control issue. Mother did not trust Elijah's father because he was never in Elijah's life, he had never wanted to be a part of his life, and he had wanted Mother to abort Elijah.

5

one of Mother's older sons that Mother had been picking the older son up from counseling, which was in violation of the safety plan.

On November 13, 2014, Salinas requested an ex parte removal of Elijah because Mother was not cooperating: she had not provided a valid address; Elijah was not in a safe situation; and there was no place for Elijah to live. Elijah was moved to foster care.

Salinas said that Mother insisted that Eliana be moved from Mr. Edwards's home. Mother said that she would rather have Eliana in foster care than with Mr. Edwards or with Elijah's alleged father, which was concerning to Salinas. During November 2013, the Texas Department of Family and Protective Services (the Department) removed Eliana from Mr. Edwards's home and placed her with Maternal Uncle.

Salinas testified that her primary concerns with Mother's parenting were related to drug issues. Because Mother had attended only two of the required twenty-eight group sessions of outpatient drug classes, Salinas believed that Mother was not determined to have her children returned to her.

### D. Caseworker's Testimony

Michelle Barker, who served as the caseworker for Elijah and Eliana, testified that when she received their case in November 2013, Elijah was in foster care, and Eliana was living with her uncle. Barker reviewed the investigation and case history and was concerned that Eliana had tested positive at birth for methamphetamine, that prior workers had trouble getting in touch with Mother,

6

that Mother was not following the safety plan, and that Mother was not completing her services for FBSS.

Barker developed a service plan for Mother that included attending all scheduled visitations, completing a drug assessment with CATS,[8] submitting to random drug testing, attending individual counseling at Merit, completing parenting classes, obtaining and maintaining safe and stable housing, obtaining employment, refraining from criminal activities and illegal acts, maintaining contact with Barker twice a month, and having no unsupervised contact with children under age sixteen. Mother indicated that she was willing to work the services and signed the service plan on December 17, 2013.

Barker attempted to give Mother an oral swab drug test on February 12, 2014; Mother refused the test and admitted to using marijuana. Barker gave Mother an oral swab drug test on May 8, 2014; Mother tested positive for methamphetamine and amphetamines, though she denied using drugs.

Mother completed a drug assessment with CATS on May 22, 2014, which recommended that she attend outpatient treatment at CATS. Two months later, Mother was discharged from CATS for noncompliance. Mother did not participate in individual counseling, she did not complete parenting classes, and

---

[8]Barker testified that CATS is an outpatient drug treatment program.

7

she did not maintain stable housing[9] or provide proof of employment or financial stability.

Barker talked to Mother on July 10, 2014, and gave her the address and phone number of where she needed to go to take a hair strand test; Barker also texted the address and phone number to Mother and informed her that she needed to complete the test by the following day. Mother admitted that she had used methamphetamine "about a month ago" and ultimately did not submit to the hair strand test. After Mother failed to take the hair strand test, Barker tried to contact Mother, but she did not answer her phone. The Department thereafter was appointed temporary managing conservatorship of Eliana because Mother was not cooperating with her service plan, because Barker had a hard time contacting Mother, and because Mother did not comply with Barker's request to submit to a hair strand test.

Barker testified that at the time of the termination trial, the children were living with Maternal Uncle in Mesquite and that he supervised Mother's visits. Barker said that Mother did not consistently visit the children and had attended only three or four visits since the children had been placed with Maternal Uncle. Barker said that Mother's last visit with the children in Mesquite was in June 2014 and that Mother had attended a birthday party at which the children were present in August 2014 but stayed only five minutes. Barker testified that Mother never

---

[9]Barker testified that throughout the case, Mother had lived with a girlfriend, a cousin, a sister, and male friends.

8

expressed a problem arranging transportation to the visits; Mother had her girlfriend drive her to the visits. Barker said that Maternal Uncle also brought the children to Fort Worth to visit relatives so that Mother would not have to drive to Mesquite.

Before the termination trial, Barker ran a background check on Mother, which revealed that Mother had been arrested on September 21, 2014, for possession of a controlled substance. Barker unsuccessfully attempted to contact Mother by phone to discuss the arrest. At the time of the termination trial, Barker did not know whether Mother was drug-free, where Mother was living, or whether Mother was employed.

Barker testified that Mother had not demonstrated an ability to provide her children with a safe and stable environment. Barker testified that the children should not be returned to Mother because of Mother's continued drug use, her unstable housing, and her failure to complete her services.

Barker testified that the children were thriving in Maternal Uncle's home. She said that Elijah had started school in August and liked it and that Eliana had grown and was doing "pretty good." Barker testified that the children are bonded to Maternal Uncle and his partner and that Maternal Uncle is bonded to the children. Barker testified that Maternal Uncle and his partner had been providing a stable, loving home and had been able to meet the children's physical, emotional, and financial needs. Barker testified that Maternal Uncle and his

9

partner will be able to meet the children's physical, emotional, and financial needs in the future.

The Department asked the trial court to terminate Mother's parental rights to Elijah and Eliana. Barker testified that terminating Mother's parental rights to Elijah and Eliana is in their best interest because it is not safe for Mother to parent young children while using methamphetamine; because the children, who were ages five and one, needed permanency; because Mother had not shown that she was capable or willing to care for them; and because the children were in a safe and stable home and were doing well there. Barker testified that it would be detrimental for the children to be returned to Mother at the time of the termination trial: Mother had admitted that she was still using drugs and had been arrested for possession of a controlled substance. The Department asked the trial court to name the Department as the permanent managing conservator of the children with the right to place them for adoption. Barker testified that the Department's plan was for the children to be adopted by Maternal Uncle and his partner.

### E. Mother's Testimony

Mother testified that her mother died when she was seven years old and that her father died shortly thereafter while he was in prison. Mother said that she had been caring for herself—including owning her own home and car—since she was fifteen years old, that she had her first son when she was sixteen years old, that her children's fathers were never part of their lives, and that she had

graduated high school when she was seventeen years old. Mother testified that her second son was born when she was twenty-two or twenty-three years old.

Mother testified that she started using methamphetamine because Eliana's father introduced her to it. She explained that he told her that if she did not eat a piece of methamphetamine, he was going to beat her up. Mother said that she complied and that he then showed her how to smoke methamphetamine. Mother said that she was not working at the time; that her three older children, which included Elijah, lived with her; that Eliana's father was the only one who was taking care of her; and that she believed she had to do what he said.

Mother testified that Eliana's father was physically abusive to her and that he was verbally abusive to her older three children. Mother testified that Eliana's father ultimately took everything that she owned and broke the windows in her house, that she had made a police report, that she had called his mother to tell her what he had done, and that his mother had found a way to keep him away so that he would not get caught.[10] Mother said that after she lost everything, her last resort was to go to her older children's father to ask for help, and "that's how all of this fell through."

Mother testified that she had used methamphetamine for approximately three years, including every two weeks while she was pregnant. Mother said that

---

[10]Mother said that she last saw Eliana's father when she was pregnant with Eliana, that he never saw Eliana after she was born, and that he was living in Mexico at the time of the termination trial.

she did not know while she was pregnant that using methamphetamine was "real bad"; Mother testified at trial that she now understands that using drugs while pregnant is harmful to the baby. Mother testified that she wanted to be clean from methamphetamine but that it was "very, very hard" not having parents or anyone to be there to support her. Mother said that she had been clean "for about a month" from methamphetamine at the time of the termination trial. Mother testified that she had used methamphetamine off and on until a month prior to the termination trial because it was the only thing that numbed her pain.

Mother testified that she had made an effort to find inpatient drug treatment but that there were no beds available. When she learned that she had finally been accepted to an inpatient treatment program, she was incarcerated.

Mother explained that she was arrested on a warrant for unpaid tickets. When the police searched Mother's purse, they found a little pouch that had a white substance in it. Mother said that the white substance was crushed ibuprofen that she was using for a toothache. Mother testified that she would be going to trial on the drug charge on the Friday following the termination trial.

Mother said that she had stopped calling Elijah because "all he can say is, [']Mom when are you coming to pick me up[?']" Mother testified that it was hard for her not to see Elijah and Eliana due to not having transportation. Mother testified that the only way she saw her children was if she arranged visits to go to see them in Mesquite. Mother said that Maternal Uncle and his partner had come to Fort Worth but that they had not given her advance notice or arranged

12

for her to see the children when they came to Fort Worth. Mother testified that she last saw her children on July 4, 2014, but she could not recall the circumstances. She said that she visited them every time she got a chance but said that she did not have transportation to visit them every time she wanted to. She said that she previously did not have any income, which prevented her from traveling to Mesquite because she would have to pay for gas if she asked someone for a ride.

When asked how she thought she could afford to provide for her children if she could not afford gas to visit them, Mother responded, "Well, see, that's why I decided not too long ago that before all of this I'm just going to get a job and then I'm going to get transportation and then I'll go forward with everything that I have to do. Because I'm not going to be able to get my kids until I have a stable home and transportation regardless. So how can I do all of it together?"

Mother testified that sometimes she did not have money to pay for her phone and that it usually stayed off for a couple of weeks each month until she borrowed money or someone paid the bill for her. Mother admitted that if Maternal Uncle had tried to contact her about visits, he would have had the same problem contacting her that her caseworker did because her phone was not always in service.

Mother admitted that as of the time of the termination trial, she did not have stable housing or employment. Mother testified that she had been employed for two weeks at the time of the termination trial. Mother explained

that she was working for a friend who cleaned houses and that she made $67 per day. Mother said that she was living at her fiancée's house, that her fiancée's mother also lived there, and that it was safe. Mother said that her fiancée was not employed and that although he had a vehicle, it was not in working condition.

Mother said that she loves her children to death, that they are the only thing she knows, and that she is only thing they know. Mother said that her dreams for Elijah and Eliana are for them to "become someone in life" and to not go through the things that she had been through. Mother said that the main thing she wanted was for Elijah and Eliana to be connected to their older siblings.

Mother understood why CPS felt like she had waited way too long to try and get things together, but she asked the trial court to deny the State's petition to terminate her parental rights to Elijah and Eliana. She felt in her heart that she could actually parent Elijah and Eliana and that they were supposed to be with her. She explained that she is the perfect mom for them and that she had made a mistake in her life and had realized that. Mother said that she was asking for the possibility of having her children returned to her in the future after she had demonstrated that she had been clean and stable for an extended period of time.

## F. Maternal Uncle's Testimony

Maternal Uncle testified that Eliana had been living with him since November 2013, that Elijah had been living with him since February 2014, and that both children were happy and healthy. Maternal Uncle testified that Elijah

14

plays with Eliana, that he had started kindergarten, and that he was not the best student but that he was trying. Maternal Uncle said that he and his partner helped Elijah with his homework and that if he needed a tutor in the future, they would be able to help with that. Maternal Uncle testified that Eliana was doing "great," that she was walking and running around, and that she could say a couple of words. Maternal Uncle said that he was employed and that Eliana stayed with his partner during the day because he was not working due to a back injury.

Maternal Uncle testified that Mother had last visited the children in his home in June 2014. He said that Mother had visited Elijah five times since February 2014 and that the visits usually lasted thirty minutes to an hour, depending on how much time Mother had. Maternal Uncle testified that Mother started visiting Eliana only after Elijah was placed with Maternal Uncle, so Mother did not visit Eliana from the time she was placed with him in November 2013 until February 2014.

Maternal Uncle testified that he came to Fort Worth once or twice a month to visit his family and that each time he came to visit, he contacted Mother ahead of time, if she answered her phone, to let her know that he was coming. Maternal Uncle testified that they had attended a birthday party on August 9, 2014; that they had invited Mother to attend so that she could visit with the children; that she had arrived five minutes before they were leaving; and that they had stayed in the parking lot for ten minutes.

15

Maternal Uncle said that the older siblings have called Elijah, that he had talked to them on the phone, but that they had never asked Elijah or Eliana to visit. Maternal Uncle said that Mr. Edwards did not want him to come there to see the older siblings because he was mad that Maternal Uncle had possession of Eliana.

Maternal Uncle testified that it was his plan to adopt the children if the trial court terminated the parents' parental rights.

## G. Disposition

After hearing the testimony and reviewing the exhibits, the trial court found by clear and convincing evidence that Mother had knowingly placed or had knowingly allowed the children to remain in conditions or surroundings that had endangered the physical or emotional well-being of the children, had engaged in conduct or had knowingly placed the children with persons who had engaged in conduct that had endangered the physical or emotional well-being of the children, had constructively abandoned Elijah, and had caused Eliana to be born addicted to alcohol or a controlled substance and that termination of the parent-child relationship between Mother and Elijah and Eliana was in the children's best interest. This appeal followed.

## III. BURDENS OF PROOF AND STANDARDS OF REVIEW

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's

16

right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2014); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, .206(a) (West 2014); *E.N.C.*, 384 S.W.3d at 802. "[C]onjecture is not enough." *E.N.C.*, 384 S.W.3d at 810. Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.*, 384 S.W.3d at 802. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, the Department must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(1) and that termination is in the

17

best interest of the child. Tex. Fam. Code Ann. § 161.001; *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

## A. Legal Sufficiency

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* "A lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the factfinder's province. *J.P.B.*,

180 S.W.3d at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

## B. Factual Sufficiency

We are required to perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated (D), (E), (N), or (R) of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(1)(D), (E), (N), (R), (2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## IV. SUFFICIENT EVIDENCE TO SUPPORT SECTION 161.001(1) FINDING

In her first and second issues, Mother argues that the evidence is legally and factually insufficient to support the trial court's findings under Texas Family Code section 161.001(1)(D) and (E).

### A. Endangerment Grounds

"Endanger" means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under section 161.001(1)(D), it is necessary to examine evidence related to the environment of the children to determine if the environment was the source of endangerment to the children's physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125. Conduct of a parent in the home can create an environment that endangers the physical or emotional well-being of a child. *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ). For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child. *See id.* at 776–77; *Ziegler v. Tarrant Cnty. Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.). Parental and caregiver illegal drug use and drug-related criminal activity likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E). It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffers injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). To determine whether termination is necessary, courts may look to parental conduct occurring before and after the child's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.). Drug use and its effect on a parent's life and her ability to parent may establish an endangering course of conduct. *See R.W.*, 129 S.W.3d at 739. Also as part of the endangering conduct analysis, a court may consider a parent's failure to complete a service plan. *See In re R.F.*, 115 S.W.3d 804, 811 (Tex. App.—Dallas 2003, no pet.).

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See S.D.*, 980 S.W.2d at 763. A factfinder may infer from past conduct endangering the well-being of the child that similar conduct will recur if the child is returned to the parent. *In re M.M.*, No. 02-08-00029-CV, 2008 WL 5195353, at *6 (Tex. App.—Fort Worth Dec. 11, 2008, no pet.) (mem. op.). Further, "evidence of improved

21

conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

Because the evidence pertaining to subsections 161.001(1)(D) and (E) is interrelated, we conduct a consolidated review. *In re T.N.S.*, 230 S.W.3d 434, 439 (Tex. App.—San Antonio 2007, no pet.); *J.T.G.*, 121 S.W.3d at 126.

## B. Analysis

Mother argues that the Department failed to present any evidence of an endangering environment because there was no evidence: that the children's living conditions prior to removal posed a danger; that Mother's current living conditions at her fiancée's home posed any threat to the children; that Mother did not provide for her children prior to their removal; or that Mother's prior criminal history or 2014 arrest subjected the children to being left alone or endangered. Mother makes similar no-evidence arguments with regard to the endangering conduct finding: that there was no evidence that she was frequently incarcerated or faced jail time while she had possession of her children, which would have subjected the children to being left alone with others, and that there was no evidence that Mother's actions endangered the children's physical or emotional well-being. The endangering environment and endangering conduct testimony presented at trial included Mother's testimony regarding her methamphetamine use and the domestic violence that she and her children endured, as well as

22

testimony from the Department that Mother had failed to work numerous aspects of her service plan.

Mother testified that Eliana's father first introduced her to methamphetamine, forcing her to eat a piece, and that Mother continued to use even after Eliana's father was out of her life. The record reflects that Mother used methamphetamine every two weeks due to stress while she was pregnant. The record also includes the lab results from Eliana's meconium, showing that she tested positive for amphetamine and methamphetamine at birth; the presence of a controlled substance in a child at birth, even without evidence of further medical effects, has been held to constitute endangering conduct to a child. *See In re M.D.V.*, No. 14-04-00463-CV, 2005 WL 2787006, at *3 (Tex. App.—Houston [14th Dist.] Oct. 27, 2005, no pet.) (substitute mem. op. on reh'g) (under an endangerment analysis under subsection (E), rejecting the suggestion that a baby born with the abnormal condition of marijuana in her system had not been harmed simply because there was no evidence of further medical effects). After the children were removed, Mother tested positive for drugs on the drug tests that she submitted to and failed to show for several requested drug tests. *See In re K.C.B.*, 280 S.W.3d 888, 895 (Tex. App.—Amarillo 2009, pet. denied) ("The trial court may infer from a refusal to take a drug test that appellant was using drugs."). Mother admitted that she had used methamphetamine for approximately three years, including a month before the termination trial.

With regard to domestic violence, Mother testified that Eliana's father was physically abusive to her, that her older three children were living with her, and that Eliana's father was verbally abusive to her older three children, including Elijah.

Although Mother completed her drug assessment, she failed to successfully complete the other services on her service plan. Mother had failed to attend individual counseling, had failed to complete parenting classes,[11] and was discharged for noncompliance with her group outpatient drug sessions at CATS. Mother had also failed to refrain from criminal activities and illegal acts; while the case was pending, Mother was charged with possession of a controlled substance and was awaiting trial on that charge at the time of the termination trial. And although Mother testified at trial that she had found a place to live and had recently obtained employment, Mother admitted that she did not have stable housing or employment at the time of the termination trial. *See J.O.A.*, 283 S.W.3d at 346 (stating that "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices").

Viewing all the evidence in the light most favorable to the trial court's judgment and recognizing that the factfinder is the sole arbiter of the witnesses'

---

[11]Based on the testimony provided by Salinas, Barker, and Mother, it appears that Mother completed a parenting class for her FBSS services but that she did not complete the parenting classes required under her CPS service plan.

credibility and demeanor, we hold (1) that there is clear and convincing evidence of endangering environment on which a reasonable factfinder could have formed a firm belief or conviction that Mother had knowingly placed or had knowingly allowed Elijah and Eliana to remain in conditions or surroundings that had endangered Elijah's and Eliana's emotional or physical well-being and (2) that there is clear and convincing evidence of endangering conduct on which a reasonable factfinder could have formed a firm belief or conviction that Mother had engaged in conduct or had knowingly placed Elijah and Eliana with persons who had engaged in conduct that had endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *In re C.W.*, No. 02-14-00274-CV, 2014 WL 7139645, at \*6 (Tex. App.—Fort Worth Dec. 12, 2014, no pet. h.) (mem. op.) (holding evidence legally sufficient to support endangering environment and endangering conduct grounds based on mother's drug use); *T.N.S.*, 230 S.W.3d at 439 (holding evidence legally sufficient under subsections (D) and (E) due to parent's drug use, incarceration, and instability).

Giving due deference to the factfinder's endangering-environment and endangering-conduct findings, without supplanting the factfinder's judgment with our own, and after reviewing the entire record, we hold that a factfinder could reasonably form a firm conviction or belief that Mother had knowingly placed or had knowingly allowed Elijah and Eliana to remain in conditions or surroundings that had endangered Elijah's and Eliana's emotional or physical well-being and that Mother had engaged in conduct or had knowingly placed Elijah and Eliana

25

with persons who had engaged in conduct that had endangered their physical or emotional well-being. *See C.W.*, 2014 WL 7139645, at *6 (holding evidence factually sufficient to support endangering environment and endangering conduct grounds based on mother's drug use); *T.N.S.*, 230 S.W.3d at 439 (holding evidence factually sufficient under subsections (D) and (E) due to parent's drug use, incarceration, and instability).

We overrule Mother's first and second issues. Because, along with a best-interest finding, a finding of only one ground alleged under section 161.001(1) is necessary to support a judgment of termination, we need not address Mother's third and fourth issues challenging the trial court's findings under subsections (N) and (R) of section 161.001(1). *See* Tex. R. App. P. 47.1; *see also In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.); *In re S.B.*, 207 S.W.3d 877, 886 (Tex. App.—Fort Worth 2006, no pet.).

## V. Sufficient Evidence to Support Section 161.001(2) Best-Interest Finding

In her fifth issue, Mother argues that the evidence is legally and factually insufficient to support the trial court's best-interest finding.

### A. Presumption and *Holley* Factors

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both the subsection (1) ground and best interest. *Id.* at 249; *C.H.*, 89 S.W.3d

26

at 28. Nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include the following:

(A) the desires of the child;

(B) the emotional and physical needs of the child now and in the future;

(C) the emotional and physical danger to the child now and in the future;

(D) the parental abilities of the individuals seeking custody;

(E) the programs available to assist these individuals to promote the best interest of the child;

(F) the plans for the child by these individuals or by the agency seeking custody;

(G) the stability of the home or proposed placement;

(H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807.

These factors are not exhaustive; some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a

27

finding. *Id.* That is, "[a] lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

## B. Analysis of *Holley* Factors

With regard to the desires of the children, neither child testified at the termination trial. Mother testified that she had stopped calling Elijah on the phone because he had always asked when she was coming to pick him up; however, Mother did not testify when she had last called Elijah. Barker testified that at the time of the termination trial, the children were bonded to Maternal Uncle and were thriving in Maternal Uncle's home. The trial court was entitled to find that this factor weighed slightly in favor of termination of Mother's parental rights to the children. *See In re M.H.*, 319 S.W.3d 137, 150 (Tex. App.—Waco 2010, no pet.).

As for the emotional and physical needs of the children now and in the future, the children's basic needs included food, shelter, and clothing; routine medical and dental care; a safe, stimulating, and nurturing home environment; and friendships and activities appropriate to their ages. Barker testified that Mother had not demonstrated an ability to provide her children with a safe and stable environment. In contrast, the record revealed that Maternal Uncle and his partner were meeting all of the children's physical and emotional needs and that if Elijah needed a tutor, they would obtain one. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to the children.

With regard to the emotional and physical danger to the children now and in the future, Barker testified that it was not safe for Mother to parent young children while using methamphetamine and that the children, who were ages five and one, needed permanency. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to the children.

With regard to Mother's parenting abilities, the record revealed that Mother had used methamphetamine while pregnant with Eliana, causing her to be born addicted to methamphetamine and amphetamine; that Mother had continued to use methamphetamine after the children were removed; that she had been discharged for noncompliance from her outpatient drug treatment at CATS; and that she had used methamphetamine up until a month before the termination trial. The record also demonstrated that Mother had endured domestic violence while Elijah was living with her and that he had endured emotional abuse from Eliana's father. The record further revealed that Mother had stopped calling Elijah on the phone because she did not want to hear him ask when she was coming to pick him up; that Mother did not visit Eliana from November 2013 to February 2014; that Mother had visited with the children only three or four times since February 2014; and that at the time of the termination trial on October 7, 2014, Mother had last visited the children at Maternal Uncle's house in June and had seen the children briefly at a birthday party in August. Although Mother allegedly completed a parenting course under her FBSS services, she remained virtually absent from her children's lives and thus did not demonstrate any skills

29

that she had learned from the classes she had attended. Moreover, although Mother had obtained housing and employment at the time of the trial, she admitted that she had not demonstrated stability in these areas and testified regarding her financial difficulties. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to the children.

The record revealed that the Department initially offered Mother FBSS services, that Mother did not stay in contact with her FBSS caseworker, and that Mother did not take advantage of those services. The record also demonstrated that Mother did not complete her CPS services. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to the children.

With regard to the plans for the children and the stability of the proposed placement, Mother testified that her dreams for Elijah and Eliana are for them to "become someone in life," to not go through the things that she had been through, and to be connected to their older siblings, but Mother admitted that she did not have stable housing or employment at the time of the termination trial and that she needed more time to demonstrate that she could remain clean and stable for an extended period of time. Maternal Uncle and his partner planned to adopt Elijah and Eliana and had demonstrated that they could provide a safe, stable home. The trial court was entitled to find that these two factors weighed in favor of termination of Mother's parental rights to the children.

30

With regard to Mother's acts or omissions that may indicate that the existing parent-child relationship is not a proper one, the analysis set forth above—which details Mother's drug use while pregnant with Eliana and Mother's continued drug use after the children were removed, the domestic violence that occurred when Elijah lived with Mother, as well as Mother's failure to take advantage of the services that she was offered—reveals that the existing parent-child relationship between Mother and the children is not a proper parent-child relationship. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to the children.

As for any excuse for Mother's acts or omissions, Mother testified that she had realized that she had made a mistake in her life, but she also gave several excuses for her acts or omissions. Mother said that she was forced by Eliana's father to eat a piece of methamphetamine or suffer physical abuse and that she did not know that using methamphetamine while pregnant could harm her unborn child. Mother also said that it was difficult for her to stay clean from drugs because she did not have her parents to support her. Mother further testified that she often could not pay her phone bill and that she could not attend all the visits that she wanted to attend because she did not have transportation to Mesquite. Although we are not unsympathetic to Mother's financial struggles, the trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to the children.

Viewing all the evidence in the light most favorable to the best-interest finding and considering the nonexclusive *Holley* factors, we hold that the trial court could have reasonably formed a firm conviction or belief that termination of the parent-child relationship between Mother and the children was in the children's best interest, and we therefore hold the evidence legally sufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(2); *Jordan v. Dossey*, 325 S.W.3d 700, 733 (Tex. App.—Houston 2010, pet. denied) (holding evidence legally sufficient to support the trial court's finding that termination of mother's parental rights was in child's best interest when most of the best-interest factors weighed in favor of termination); *In re L.M.*, 104 S.W.3d 642, 648 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (holding evidence legally sufficient to support best-interest finding; mother admitted that she had placed child in danger by using drugs while pregnant, mother continued to use drugs after child was taken from her, mother failed to enter a ninety-day residential drug treatment program made available to her, and caseworker testified that child was adoptable and that termination was in child's best interest).

Similarly, reviewing all the evidence with appropriate deference to the factfinder, we hold that the trial court could have reasonably formed a firm conviction or belief that termination of the parent-child relationship between Mother and the children was in the children's best interest, and we therefore hold that the evidence is factually sufficient to support the trial court's best-interest

32

finding.  *See* Tex. Fam. Code Ann. § 161.001(2); *Jordan*, 325 S.W.3d at 733 (holding evidence factually sufficient to support the trial court's finding that termination of mother's parental rights was in child's best interest when most of the best-interest factors weighed in favor of termination); *S.B.*, 207 S.W.3d at 887–88 ("A parent's drug use, inability to provide a stable home, and failure to comply with [a] family service plan support a finding that termination is in the best interest of the child.").

We overrule Mother's fifth issue.

## VI. CONCLUSION

Having overruled Mother's first, second, and fifth issues, which are dispositive of this appeal, we affirm the trial court's judgment terminating Mother's parental rights to Elijah and Eliana.

PER CURIAM

PANEL:  WALKER, DAUPHINOT, and GARDNER, JJ.

DELIVERED:  March 19, 2015